IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 3, 2012 Session

## BRADLEY COUNTY, TENNESSEE v. THE CITY OF CLEVELAND, TENNESSEE

**Appeal from the Chancery Court for Bradley County**
**No. 09-177      Jerri S. Bryant, Chancellor**

**No. E2012-00634-COA-R3-CV-FILED-OCTOBER 30, 2012**

The plaintiff in this action is Bradley County ("the County"). The sole defendant is the City of Cleveland ("the City"). The County's complaint seeks a determination that the proceeds of a 2009 local option county sales tax increase, enacted shortly after an identical increase by the City, is to be distributed between the parties according to a contract ("the Contract") the parties signed in 1967 as opposed to a statutory provision for distribution based on the site of collection of the tax. The City filed a counterclaim which, as amended, seeks a determination that the Contract is void; that the Contract does not control distribution of the proceeds of a 1982 tax increase; that the Contract does not control distribution of the proceeds of the 2009 tax increase; and that, by statute, the City is entitled to all of the proceeds of the 2009 tax increase on sales made inside the city limits through the City's 2010 fiscal year. The trial court upheld the validity of the Contract and further held that the Contract, as amended twice, *i.e.,* in 1972 and in 1980, controls distribution between the parties of the proceeds of the County's 1982 tax increase. The court held that the applicable statute, rather than the Contract, controls distribution of the proceeds of the 2009 tax increase; this latter holding is not at issue in this appeal. The court further held that the City's statutory right to the proceeds of the 2009 tax increase on sales in the City ended June 30, 2009, which equates with the City's 2009 fiscal year. The City appeals. We affirm that part of the judgment upholding the validity of the Contract and that part applying the Contract to the distribution of the 1982 tax increase. We reverse that part of the judgment that held the City's statutory right to proceeds from the 2009 tax increase ended June 30, 2009. We hold that the City is entitled to the 2009 tax increase on sales in the city through the City's 2010 fiscal year.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed in Part and Reversed in Part**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Douglas S. Johnston, Jr. and Scott P. Tift, Nashville, Tennessee, and John Kimball, Cleveland, Tennessee, for the appellant, City of Cleveland, Tennessee.

James F. Logan, Jr., Cleveland, Tennessee, for the appellee, Bradley County, Tennessee.

**OPINION**

I.

To put some context to the puzzle we must solve in this case, it will be helpful to have a working understanding of certain provisions of the 1963 Local Option Revenue Act ("the Act"), now codified, as amended, at Tenn. Code Ann. §§ 67-6-701 through 716 (2011).[1] Within certain limitations, counties and incorporated towns are empowered to levy a sales tax above and beyond the state-imposed sales tax rate. Tenn. Code Ann. § 67-6-702(a)(1). In 1963 the maximum local rate was two and one quarter percent (2.25%). The local maximum rate has increased over time to two and three quarters percent (2.75%). *Id*. If a city levies a tax, or a tax increase, and the county does not follow suit, the city is entitled to the proceeds of any tax collected within the city limits above the county tax rate. Tenn. Code Ann. § 67-6-703(a)(1)[2]. A county may completely preempt an increase by a city by enacting its own corresponding increase within a certain defined time period, in which case the city ordinance becomes "null and void." Tenn. Code Ann. § 67-6-703(b)[3]. If the county increase

_____

[1]Neither party has argued that amendments to the Act that take effect July 1, 2013, should affect our analysis.

[2]In pertinent part, subsection 703 (a)(1) states:

> The levy of the tax by a county shall preclude, to the extent of the county tax, any city or town within such county from levying the tax, but a city or town shall at any time have the right to levy the tax at a rate equal to the difference between the county tax and the maximum rate authorized in this chapter.

[3]Tenn. Code Ann. § 67-6-703(b) states:

> If an ordinance levying the tax authorized by this part is adopted by a city or town prior to adoption of the tax by the county in which the city or town is located, the effectiveness of the ordinance shall be suspended for a

(continued...)

happens at a later date, the city is allowed to receive, from the county tax, the full benefit of what it would have received from its own tax "until the end of the current fiscal year of the city or town." ***Id***. The effective date of the County's preemption of the City's 2009 tax increase is one of the issues in this case.

The other issues in this case concern the distribution of county taxes once collected. The Act requires that a portion of county taxes be distributed to incorporated cities within that county. The parameters of distribution are set forth in Tenn. Code Ann. § 67-6-712 (2011), as follows:

> (a) The tax levied by a county under this part shall be distributed as follows:
>
> (1) One-half ( 1/2 ) of the proceeds shall be expended and distributed in the same manner as the county property tax for school purposes is expended and distributed; and
>
> (2) The other one-half ( 1/2 ) as follows:

---

[3](...continued)

> period of forty (40) days beyond the date on which it would otherwise be effective under the charter of the city or town. If during this forty-day period, the county legislative body adopts a resolution to levy the tax at least equal to the rate provided in such ordinance, the effectiveness of the ordinance shall be further suspended until it is determined whether the county tax is to be operative, as provided in § 67-6-706. If the county tax becomes operative by approval of the voters as provided in § 67-6-706, the ordinance shall be null and void, but if the county tax does not become operative, the ordinance shall become effective on the same date that the county tax is determined to be nonoperative, and the election required by § 67-6-706 shall be held. After initial adoption of the tax by a county or a city or town therein, the tax rate may be increased by a city, town or county under the same procedure. If the tax levied by a county legislative body is finally determined to be nonoperative, such action shall not preclude subsequent action by the county to adopt the tax at a rate at least equal to the city or town tax rate, in which event the city or town tax shall cease to be effective; provided, that the city or town shall receive from the county tax the same amounts as would have been received from the city or town tax until the end of the current fiscal year of the city or town.

(A) Collections for privileges exercised in unincorporated areas, to such fund or funds of the county as the governing body of the county shall direct;

(B) Collections for privileges exercised in incorporated cities and towns, to the city or town in which the privilege is exercised;

(C) *However, a county and city or town may by contract provide for other distribution of the one-half ( 1/2 ) not allocated to school purposes.*

(Emphasis added.) The proceeds earmarked "for school purposes" are distributed in proportion to the average daily attendance ("the ADA") in the city's schools compared to the county's schools. ***City of Harriman v. Roane County***, 553 S.W.2d 904, 908 (Tenn. 1977).

In 1967, shortly after the County enacted a tax rate of 2.25%, the City and the County entered into an agreement of the type allowed by Tenn. Code Ann. § 67-6-712(a)(2)(C), which agreement we have defined as "the Contract." The Contract states in pertinent part:

1. One-half of the net proceeds from the local sales tax received by Bradley County from the State of Tennessee shall be used exclusively for school purposes and shall be appropriated to Bradley County and the City of Cleveland for school operational purposes as provided in [67-6-712(a)](1).

2. The remaining one-half of the net proceeds from the local sales tax received by Bradley County from the Department of Revenue of the State of Tennessee, being that portion distributable according to Section [67-6-712(a)](2) of Tennessee Code Annotated shall be distributed between Bradley County and the City of Cleveland by reversing the percentages in Paragraph 1 hereof and distributing the same to the City of Cleveland and Bradley County in accordance with the reverse percentages of Paragraph 1.

3. This formula for the distribution of the second one-half of the net proceeds from the local sales tax shall be used to distribute the same until such time as the average daily attendance of

-4-

children in the two school systems shall reach 50% for each system at and from which time the second one-half of said proceeds shall be distributed by each system taking the same per cent as it received in distribution of the first one-half of said proceeds.

The net result of the Contract is to split the taxes between the County and the City on an equal, 50-50, basis until such time as the ADA for the City schools equals the ADA in the County schools. To illustrate using hypothetical figures, if the ADA of the City's schools is 30% and the County's is 70%, the first half of the proceeds of the local County tax is distributed 30% to the City and 70% to the County, but the second half is distributed 70% to the City and 30% to the County, in effect, as previously noted, resulting in an equal distribution of the total County tax to the two governmental entities.

In contemplation of another local sales tax increase, the parties executed an amendment to the Contract on February 21, 1972 ("the 1972 Amendment"). The 1972 Amendment states, in pertinent part:

> WHEREAS, the parties have heretofore on May 10, 1967 entered into an agreement concerning the division of local sales tax; and
>
> WHEREAS, the Bradley County Quarterly Court has adopted a resolution which provides for the collection of additional sales tax if the same is approved by a referendum of the people of Bradley County held for that purpose; and
>
> WHEREAS, the parties desire to enter[] into an agreement for the division of the moneys received from said additional sales tax if the same is passed;
>
> NOW, THEREFORE, . . . it is agreed by and between Bradley County and the City of Cleveland that any moneys received from any additional sales tax shall be divided in accordance with the agreement between the parties dated May 10, 1967.

The referendum passed and the proceeds of the 1972 increase were thereafter distributed by the terms of the Contract.

In 1980, the county commission for the County voted to hold a referendum to raise the local option sales tax yet again. The commission also approved a second amendment ("the 1980 Amendment") to the Contract in contemplation of approval of the tax increase. The governing body for the City also approved execution of the 1980 Amendment. However, the County's referendum failed.

The County held another referendum in 1982 on an increase identical to the increase which failed in 1980. The 1982 referendum passed. Neither party authorized an amendment addressed specifically at the 1982 increase. The City concedes in its brief that until the time it filed its amended counterclaim, it "acquiesced in the division of the net proceeds of the 1982 local sales tax increase in accord with the formula set forth in the [C]ontract." In its answer, the City states, "No further amendment to the 1967 Contract was necessary in 1982 because on information and belief the parties had already agreed to an amendment in 1980." That answer was not amended even though the City tendered an amended counterclaim[4] that raised the issue of whether the Contract applies to the 1982 tax increase.

Sometime in the 1990s , the City instituted an action against the County which came before this Court on appeal. *City of Cleveland v. Bradley County*, No. 03A01-9804-CV-00140, 1999 WL 281086 (Tenn. Ct. App. E.S., filed April 16, 1999)("*Cleveland I*"). Among other things, the City sought a determination in *Cleveland I* that the Contract was void and that one -half of the funds collected between 1992 and 1996 through the County's local sales taxes should have been distributed per the statutory default formula based on site of collection, Tenn. Code Ann. § 67-6-712(a)(2)(B), rather than by the Contract formula. *Cleveland I* at *2. For the years 1992 through 1996 the City claimed it would have received approximately $3,400,000 more under the statutory site of collection formula than under the Contract. *Id*.

We noted in our opinion in *Cleveland I* that during the early years of the Contract, it was advantageous to the City because "most of the collected tax receipts would be collected outside the City limits." *Id*. at *1. The arguments the City advanced on appeal in the first case to void the Contract were (1) the Contract was an ultra vires act, (2) the Contract was a perpetual contract with no prospect of termination and (3) the Contract was in violation of public policy by binding all future governing bodies. *Id*. at *4-7. We held against the City on each point. *Id*.

---

[4]We use the term "tendered" because even though the City filed a motion to amend its counterclaim, no order was ever entered allowing the amendment. Because both parties addressed the issues in the trial court as if the amendment had been allowed, and the trial court addressed the issue of whether the revenues of the 1982 tax increase are to be distributed by the terms of the Contract, we are treating the amendment as having been allowed by implied consent. Tenn. R. Civ. P. 15.02.

On December 8, 2009, the City passed an ordinance authorizing an increase of one-half of one percent (.5%) in the City sales tax rate, subject to approval by referendum. The County declined to approve a matching increase. The City's referendum, held on March 10, 2009, adopted the sales tax increase. On March 16, 2009, the County commission reversed course and approved a referendum on whether to adopt an increase that matched the City's sales tax increase. On or about March 25, 2009, the City passed a resolution stating that "it d[id] not intend to further amend the [1967] contract to provide for the same distribution of the additional one-half cent sales tax increase approved on March 10, 2009." The County referendum, held May 14, 2009, approved a sales tax increase for the County of one half of one percent (.5%). Voters inside the city were not allowed to vote in that election.

The County filed this action shortly after its successful referendum election. The County sought a determination that the revenue generated by its 2009 sales tax increase must be distributed by the terms of the Contract and not by the site of collection method provided in the statute. *See* Tenn. Code Ann. § 67-6-712 (a)(2)(B). The City filed an answer and counterclaim in which it asked for declarations that (1) the Contract is void as a perpetual contract, (2) the Contract does not apply to the 2009 tax increase and (3) the City is entitled to all proceeds of its 2009 sales tax increase through its fiscal year ending June 30, 2010. The City later tendered an amended counterclaim asking for a determination that the Contract does not apply to the 1982 sales tax increase.

Each party filed a motion for summary judgment. They stipulated that no material facts are in dispute and that all issues are issues of law that are appropriate for determination by summary judgment. Accordingly, the court held that the case was "appropriate for summary judgment" which it granted in an order that states, in pertinent part:

> The [City's] defenses of *ultra vires* acts, unconstitutionality of the agreement, and lack of a termination clause are all *res judicata* to this case, and these defenses are denied.
>
> The court finds the [C]ontract is ambiguous on [the] question [of whether it applies to all future tax increases without amendment or ratification by the City and County].
>
> The argument of the City . . . [that the Contract only applies if it is amended by resolution of the governing bodies] is persuasive in looking at the entire document and actions by Resolution when attempting contract interpretation. When reading the Resolutions and contracts, it is the opinion of this court that each contract and amendment is subject to more than

one reasonable interpretation. Because of this, the court must look further. Discerning the meaning of the disputed clause above, the court must also look at the grammar that was used in constructing the sentence. The court begins by assuming that the parties drafting the documents meant to draft them as signed. The City alleges the 1972 Amendment referred only to the tax raised in that particular Referendum. The County urges this court to find that the words "any additional taxes" mean all future taxes ever passed by the governing bodies. However, the word future was not used in describing taxes in [the 1972 Amendment]. The 1980 [Amendment] contained basically the same wordage. Additionally, the actions of the parties verify that with each new tax a new agreement was drawn. Otherwise, the 1980 (1982) Amendment would have been unnecessary. Under the law, the conduct of the parties is the strongest evidence of their original intent. ***Pinson & Assoc. Ins. Agency, Inc. v. Kreal***, 800 S.W.2d 486 (Tenn. Ct. App. 1990).

When reading the document as a whole, it speaks specifically to the tax being raised at that time, and there is no indication of any intention to bind all future sales tax increases with one agreement. The parties conducted themselves in that manner. They intended each action (1972 and 1980 contracts) to be meaningful.

There is no mention in the Minutes of either party of their intention to bind future boards for more than the original term of each agreement.

The court holds the City did not have to share any property taxes with the County until such time as the County passed its own Referendum. At that point in time, pursuant to statute, the City was allowed to collect its own sales tax through that current fiscal year which ended June 30, 2010. After that appointed time and absent any agreement between the parties, the statute sets the basis for which the sales tax is to be divided.

(Paragraph numbering in original omitted.)

Each party filed a motion to alter or amend the judgment. The court granted the County relief regarding the date through which the City was entitled to the full benefit of its tax increase notwithstanding the later matching increase by the County. The court held "that the Order filed in this matter should state the operative date [of the County tax increase] was May 15, 2009. The first day of collection of tax would be July 1, 2009 instead of June 30, 2010." In its motion to alter or amend, the City sought, among other things, a ruling that the Contract did not apply to the 1982 County tax increase. The court denied the City's motion, stating: "This court previously held alternatively that those issues are res judicata and precluded by the previous lawsuit between the parties or that the conduct of the parties has affirmed the operation of that <u>agreement</u> that was approved in 1980 as the Referendum ultimately passed in 1982." (Underlining in original.)

## II.

The City raises the following issues[5] which we have quoted verbatim from the City's brief:

> Did the City of Cleveland and Bradley County amend their 1967 Contract to extend its sales tax distribution formulas to the 1982 local option sales tax increase, and, if not, should the proceeds of the 1982 sales tax increase be divided pursuant to the default formula set forth in T.C.A. § 67-6-712(a)(2)(B), rather than the formula set forth in the 1967 Contract?
>
> Is the 1967 Contract void, voidable, or terminable with reasonable notice as a perpetual Contract?
>
> Is the City entitled to all proceeds of the 2009 tax increase collected within the city limits through June 30, 2010?

## III.

The parties stipulated below that there are no genuine issues of material fact and that the trial court should decide all issues as questions of law. In light of that stipulation, we are concerned simply with which party prevails as a matter of law on which issue or issues. Thus, our review is de novo, with no presumption that the trial court's rulings of law are correct. ***In re Angela E***., 303 S.W.3d 240, 246 (Tenn. 2010).

---

[5]Originally, the City raised an issue as to the constitutionality of the County's 2009 referendum election which excluded City voters. The City has withdrawn that issue with our permission.

-9-

IV.

A.

We will begin with the second issue first. The City argues that the Contract was a perpetual contract void from its inception. Alternatively, the City argues for the same reason that the Contract was voidable or terminable upon an implied term of reasonable notice. The City would have us order the redistribution of all revenues taken in under the County local option sales taxes since the time it filed its counterclaim and put the County on notice that it no longer intended to be bound by the Contract. *See Town of Morrison v. Warren County*, No. 01A01-9508-CH-00332, 1995 WL 755586 at *4 (Tenn. Ct. App. M.S.,filed Dec. 22, 1995)(holding that the Town of Morrison was entitled to recover its statutory share of local option taxes from the date it gave Warren County notice that it would no longer be bound by an ultra vires contract). The issue of the validity of the Contract was fully litigated and determined on the merits in *Cleveland I*. We held in that opinion that "the City's mayor had the authority to enter into the Contract with Bradley County, since it was for a system of free schools and at that time was in the City's best interest." *Id*. at *6. We further held that the Contract contains a termination provision and is therefore not subject to attack as a perpetual contract. *Id*. We also held, for two reasons, that the Contract was not against public policy for tying future City council members to a contract that may not be in the City's best interest during their future tenure. *Id*. First, we held that the law in Tennessee clearly allows governing bodies of municipalities to enter into long term contracts for the distribution of local option taxes. *Id*. at *6-7. Second, we held that the "City having received the benefit of its bargain in the early years of the Contract . . . is obligated to honor its Contract with Bradley County during the period when Bradley County is receiving its benefit." *Id*. at *7.

The related doctrines of res judicata and collateral estoppel prevent the City from re-litigating the issue of the validity of the Contract in this second action. *See, e.g., Richardson v. Tennessee Board of Dentistry*, 913 S.W.2d 446 (Tenn. 1995). The Supreme Court explained the relationship between and the effect of a finding of res judicata and collateral estoppel in *Richardson*:

> The term "res judicata" is defined as a "[r]ule that a final judgment rendered by a court of competent jurisdiction on the merits is conclusive as to the rights of the parties and their privies, and, as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand or cause of action. . . ." . . . .

The doctrine of res judicata bars a second suit between the same parties or their privies on the same cause of action with respect to all issues which were or could have been litigated in the former suit. Collateral estoppel operates to bar a second suit between the same parties and their privies on a different cause of action only as to issues which were actually litigated and determined in the former suit.

. . . One defending on the basis of res judicata or collateral estoppel must demonstrate that 1) the judgment in the prior case was final and concluded the rights of the party against whom the defense is asserted, and 2) both cases involve the same parties, the same cause of action, or identical issues.

*Id*. at 459 (citations omitted). The ***Richardson*** opinion explained that

the doctrines of res judicata and collateral estoppel are very similar. Res judicata bars litigation if a second suit involves the same parties and the same cause of action that was determined in the first action. Collateral estoppel prevents identical parties from relitigating in a different action issues determined in a previous suit.

*Id*. n.11.

The City acknowledges that our decision in ***Cleveland I*** addressed the validity of the Contract, but asserts that we should revisit the issue because (1) ***Cleveland I*** wrongly decided that the contract was terminable and (2) ***Cleveland I*** has resulted in a "manifest injustice" which should be corrected. The County correctly points out that the doctrines of res judicata and collateral estoppel are not founded upon the idea that the first judgment is always correct. We have addressed this issue:

[t]he policy rationale in support of Res Judicata is not based upon any presumption that the final judgment was right or just. Rather, it is justifiable on the broad grounds of public policy which requires an eventual end to litigation. Akin to statutes of limitations, the doctrine of Res Judicata is a "rule of rest" and "private peace". . . .

-11-

. . . . It is not material on this point whether the finding . . . was right or not in the former suit. That cannot be questioned any more between the same parties or their privies. Right or wrong the question was finally closed, unless a new trial had been obtained in the same suit. This rule is not alone for the benefit of the parties litigant, to put an end to strife and contention between them, and produce certainty as to individual rights, but it is also intended to give dignity and respect to judicial proceedings, and relieve society from the expense and annoyance of indeterminable litigation about the same matter.

*Regions Financial Corp. v. Marsh USA, Inc.*, 310 S.W.3d 382, 400 - 401 (Tenn. Ct. App. 2009)(*quoting Moulton v. Ford Motor Co.*, 533 S.W.2d 295, 296 (Tenn. 1976)).

The City has pointed us to no case in Tennessee where a party to a prior case against the same opponent has been allowed to relitigate an issue tried in the prior case. Even if we were convinced that some exception to res judicata would allow us to revisit the results of prior cases between the same parties to correct a previous error, or even a "manifest injustice," we would nevertheless decline the City's invitation in the present case. One aspect of our decision in *Cleveland I* that the City avoids completely is our determination that the Contact was to the City's advantage in those years "when most of the collected tax receipts would be collected outside the City limits." *Cleveland I* at *1. Given the challenge in this case, we assume the advantage of the Contract formula has now shifted to the County, although we are not told exactly when that happened. We believe it is somewhat disingenuous to now say, with the benefit of over 40 years of hindsight, that there was something wrong or manifestly unjust in the Contract or the decision upholding it. If such a shift in advantage, or the duration of the advantage, were grounds for termination, we wonder if all executory contracts would become subject to challenge. Accordingly, for the reasons we have discussed, we hold that *Cleveland I* bars this second action contesting the validity of the Contract and seeking to terminate it.

B.

We turn now to the issue of whether the Contract, as amended, applies to the 1982 tax increase. We hold that it does, for numerous reasons. First, notwithstanding the numerous arguments in the City's brief, the City admits in its answer that the 1980 Amendment made the Contract applicable to the 1982 county tax increase. The answer states: "No further amendment to the 1967 Contract was necessary in 1982 because on information and belief the parties had already agreed to an amendment in 1980." That answer has not been amended. A party is not allowed to take one position in the trial court and then take a

-12-

contrary position on appeal. *Cain-Sloan Co. v. Louisville & N. R. Co.*, 424 S.W.2d 787, 792 (Tenn. 1968)("Taking this position in the Circuit Court with respect to the status of Paramount as a freight forwarder, Cain-Sloan cannot change it in this Court."); *Price v. Tennessee Products & Chemical Corp.*, 385 S.W.2d 301, 307 (Tenn. Ct. App. 1964)(not allowed to take position on appeal that was inconsistent with position in the trial court that the parties had a coal lease).

Second, even though the City claims that the issue of the applicability of the Contract to the 1982 tax increase was not litigated in *Cleveland I*, we hold that the principle of res judicata bars the litigation of that issue in this second action. In *Cleveland I*, the City sought a declaration that it was entitled to receive distribution according to the site of collection rather than under the Contract. It made the argument that it would have received approximately $3.4 million more for the time period 1992 through 1996 under the site of collection formula of distribution than it received under the Contract. Since the 1982 tax increase was in effect at that time, and generated a portion of the revenues subject to distribution, it is beyond question that those funds were part of the dispute in *Cleveland I*. Alternatively, is clear that the City could have raised the issue in *Cleveland I* of whether the Contract was applicable to the 1982 tax increase. It is also clear that the doctrine of res judicata applies to "all issues which were or could have been litigated in the former suit." *Richardson*, 913 S.W.2d 459. Because the question of the applicability of the Contract to the 1982 county tax increase was impliedly determined, and, alternatively, because the issue could have been raised in *Cleveland I*, we hold that *Cleveland I* is res judicata to any claim that the Contract is not applicable to the 1982 tax increase.

Finally, alternatively, we hold that the actions of the parties for nearly 25 years confirm an intent that the 1980 Amendment makes the Contract applicable to the 1982 tax increase. It is necessary for the sake of clarification that we comment on one matter that has not been appealed. The trial court held that the Contract does not control distribution of the 2009 tax increase. The County has not raised an issue as to that aspect of the trial court's judgment. In fact, the County asks, without reservation, "that this Court affirm the Trial Court judgment." The trial court reached its holding that the Contract and subsequent amendments do not control distribution of the 2009 increase by the following reasoning:

> The City alleges the 1972 Amendment referred only to the tax raised in that particular Referendum. The County urges this court to find that the words "any additional taxes" mean all future taxes ever passed by the governing bodies. However, the word future was not used in describing taxes in this contract. The 1980 agreement contained basically the same wordage. Additionally, the actions of the parties verify that with each new

tax a new agreement was drawn. Otherwise, the 1980 (1982) Amendment would have been unnecessary. Under the law, the conduct of the parties is the strongest evidence of their original intent. *Pinson & Assoc. Ins. Agency, Inc. v. Kreal*, 800 S.W.2d 486 (Tenn. Ct. App. 1990).

When reading the document as a whole, it speaks specifically to the tax being raised at that time, and there is no indication of any intention to bind all future sales tax increases with one agreement. The parties conducted themselves in that manner. They intended each action (1972 and 1980 contracts) to be meaningful.

There is no mention in the Minutes of either party of their intention to bind future boards for more than the original term of each agreement.

Despite urging us to affirm the trial court in all respects, the County argues we should hold that the language in the 1972 Amendment, "any moneys received from any additional sales tax shall be divided in accordance with [the Contract]," means that any future tax increase will automatically come under the operation of the Contract without any need for an amendment to the Contract or ratification of its application to any such tax increase. We are not receptive to the County's approach of arguing that the trial court should be affirmed in all respects while inviting us to depart completely from the trial court's rationale.

We agree with and adopt the trial court's reasoning as to the construction of the Contact and all future amendments in light of the action of the parties. This includes its determination that the City's actions confirm the intent that the 1980 Amendment makes the Contract applicable to the distribution of the 1982 tax increase. First, it is our understanding that at that time, distribution pursuant to the contract was still better for the City than distribution per the site of collection. That is likely why the City focused in *Cleveland I* on the collections in the years 1992 through 1996. The City's intent that the Contract control distribution of the 1982 tax increase we believe is the best explanation for why the City did not expressly articulate its challenge in these terms in *Cleveland I*. Our opinion in *Cleveland I* was filed in 1999, and for another ten years the City did not challenge distribution under the Contract of tax collections under the 1982 increase. Even when the City filed its answer in the present case, it admitted that "[n]o further amendment to the . . . Contract was necessary in 1982 because on information and belief the parties had already agreed to an amendment in 1980." Despite its argument to rescind any further acquiescence, the City has not amended its answer. We hold that by its actions in close proximity to the 1980

Amendment and the 1982 adoption by the County of a tax increase and for approximately 25 years thereafter, the City has confirmed its intent that the Contract control distribution of the proceeds of the County's 1982 tax increase. *See Planters Gin Co. v. Fed. Compress & Warehouse Co. Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002)(goal in contract construction is to ascertain and give effect to the intent of the parties at the time the contract is executed); *Pinson*, 800 S.W.2d at 487 (circumstances at the time of the contract to be considered; course of conduct is the stongest evidence of the parties' intent).

Before leaving this issue, we note that the City relies heavily on *Town of Morrison*, 1995 WL 755586 at *4 for the proposition that acquiescence alone does not validate distribution of taxes in the future by a formula to which a municipality has not agreed. *Town of Morrison* does not control the present case because in 1980 the City agreed to amend the Contract so as to divide a tax increase that was identical to the 1982 county increase. Their actions thereafter, as we have held, confirm an intent that the 1980 Amendment continue in effect and be applied to the 1982 tax increase.

C.

The final issue left for resolution is the ending date of the City's right to the exclusive benefit of its own 2009 tax increase, notwithstanding the County's enactment of an identical increase. This is a matter of statutory construction and application of that interpretation to the timing of the 2009 increases by the City and the County. We begin with the informative statutory language. As we have stated, if a town enacts a sales tax increase, a county may completely preempt that increase by acting within a narrow time window. Tenn. Code Ann. § 67-6-704(b). It is undisputed that the County did not act within that narrow window. The County's failure to act within that window does not prohibit it from adopting an increase at a later time. This is clear from the language of Tenn. Code Ann. § 67-6-704(b):

> After initial adoption of the tax by a county or a city or town therein, the tax rate may be increased by a city, town or county under the same procedure. If the tax levied by a county legislative body is finally determined to be nonoperative, such action shall not preclude subsequent action by the county to adopt the tax at a rate at least equal to the city or town tax rate, in which event the city or town tax shall cease to be effective, provided, that the city or town shall receive from the county tax the same amounts as would have been received from the city or town tax until the end of the current fiscal year of the city or town.

The "operative date" of an increase in local option taxes is

> the date that the county election commission makes its official
> canvas of the election returns; provided, however, that no tax
> shall be collected under any such ordinance or resolution until
> the first day of a month occurring at least thirty (30) days after
> the operative date.

Tenn. Code Ann. § 67-6-706(a)(3).

It is undisputed that the fiscal year for both the City and the County runs from July 1 to June 30. The parties agree that the first date the County could collect taxes on its 2009 increase was July 1, 2009. The City argues that is the date that defines the "current fiscal year" during which the City was entitled to receive "from the county tax the same amounts as would have been received from" its own tax increase. The County argues that the date the tax becomes collectible is meaningless in this context; it is, rather, the date the County "adopts" the tax increase that controls. Neither party provides us with any legislative history. The County argues that nothing is needed beyond the plain language of the statute. S*ee* ***Carson Creek Vacation Resorts, Inc. v. Dept. of Revenue***, 865 S.W.2d 1. 2 (Tenn. 1993)(where the meaning of a statute is clear and unambiguous, the courts must simply obey what the legislature has said). In construing a statute, the goal is to ascertain and give effect to the intention of the legislature. *Id*. We look to the ordinary meaning of the language used, without attempting to force or mold it into something that it is not. *Id*. We presume that the statute did not intend an absurd result in its application. ***Brundage v. Cumberland County***, 357 S.W.3d 361, 365 (Tenn. 2011). We also "endeavor to give effect to every clause, phrase, or word in the statute." ***Lee Medical, Inc. v. Beecher***, 312 S.W.3d 515, 527 (Tenn. 2010).

We find ourselves in agreement with the City that it is entitled to receive, from the county tax increase, "the same amounts as would have been received from the city or town tax until the end of the [2010] fiscal year." The reason for our conclusion is that the County's approach renders the phrase "received from the county tax" meaningless. In this case, the tax increase did not become "the county tax" until July 1, 2009, at which time the county became entitled to collect it.

We believe that this result is consistent with an orderly approach to tax collection and distribution between counties and towns within their borders. Since a county cannot collect tax until at least 30 days after the operative date of a county sales tax increase, we believe the statute should be interpreted to make the date a city tax ceases to be effective under section 704(b) synonymous with the date a county can begin collecting the tax, and when a city is to receive the proceeds of a county tax for the remainder of that city's fiscal year during

-16-

which the county begins to collect the tax. If we do not adopt and follow an interpretation that makes Tenn. Code Ann. § 67-6-704 consistent with Tenn. Code Ann. § 67-6-706, we run the risk of allowing absurd results where neither a city nor the county can collect the tax during a specific time window, or where a county may have to pay over to a city taxes that it cannot yet collect.

We hold that the fiscal year for which the City is entitled to receive all proceeds from the County tax that it would have received under its own tax is the City's 2010 fiscal year because it was during that year that the tax at issue became "the county tax." Thus, the City shall be entitled to receive the proceeds of the 2009 tax increase on sales within the city limits from July 1, 2009 to June 30, 2010.

V.

The judgment of the trial court is affirmed in part and reversed in part. That part of the judgment upholding the validity of the Contract is affirmed as is that part of the judgment holding that the Contract controls distribution of the proceeds of the 1982 tax increase. That part of the judgment holding that the City's right under the 2009 tax county tax increase to the "same amounts" it would have received under its own 2009 increase ended June 30, 2009 is reversed. The City is entitled to receive those proceeds for its 2010 fiscal year, which began July 1, 2009 and ended June 30, 2010. Costs on appeal are taxed one-half to each party. This case is remanded for enforcement of the judgment as modified by our opinion and for collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE